IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ARBBIE M. HODGE,

          Petitioner,                    No. CIV S-06-483 FCD CHS P

     vs.

THOMAS L. CAREY, Warden, et al.,

          Respondents.      FINDINGS AND RECOMMENDATIONS

_____/

## I.  INTRODUCTION

Petitioner Arbbie M. Hodge is a state prisoner proceeding through counsel with a first amended petition for writ of habeas corpus filed pursuant to 28 U.S.C. §2254.  Petitioner is currently serving an indeterminate prison term of 16 years to life following his 1979 conviction for second degree murder in Los Angeles County.  Here, petitioner does not challenge the constitutionality of that conviction, but rather, the execution of his sentence, and specifically, the February 20, 2004 reversal by Governor Schwarzenegger of the September 25, 2003 decision of the Board of Prison Terms that petitioner was suitable for parole.  The pending petition presents a single ground for relief: that the Governor's reversal is unsupported by some evidence in the record in violation petitioner's right to due process of law.  Based on a thorough review of the record and applicable law, it is recommended that the petition be granted.

## II.  BACKGROUND

On the morning of January 14, 1979, sometime after 4:00 a.m., several individuals were involved in a street fight.  Petitioner struck the victim, Thurman Allen, in the head with a baseball bat, causing his death.

At his September 15, 2003 hearing, petitioner related the events leading up to the murder as follows.  (*See* Exhibit 13, Subsequent Parole Consideration Hearing, September 25, 2003 at 13-15, 42-48.)[1]  Petitioner stated that he and his girlfriend, Barbara Hines,[2] were inside a Long Beach residence with another woman, Claire Hoff.   Hines and Hoff got into a physical altercation inside the residence and exited the house, fighting "from the residence all the way out into the middle of the street."  Petitioner heard Hines "hollering" and looked outside where he saw the victim, Thurman Allen, swinging a two foot by two foot window frame which had been converted into a picture frame at Hines.  Petitioner called out to Allen causing Allen to turn and approach petitioner.  Petitioner reached into the house and grabbed a baseball bat.  Petitioner and Allen began fighting.  Hoff ran away down the street and Hines ran into the residence.  Petitioner struck Allen in the head with the bat and Allen fell to the ground.  Petitioner indicated that because they had run away, neither Hoff nor Hines saw him strike Allen with the bat.

Allen was taken to the hospital where he died four days later; petitioner and Hines fled the area and were later apprehended.  Petitioner states that he threw the bat across the street, although no bat was recovered.  Prior to 1988, petitioner had claimed that he struck Allen with the converted wooden frame which he had wrestled away from Allen.

After rejecting a plea agreement to a manslaughter charge, petitioner proceeded to trial and was convicted by jury of second degree murder with personal use of a dangerous or deadly weapon.  He was sentenced to serve 16 years to life in state prison.  His minimum eligible

---

[1] All citations to exhibits refer to the exhibits attached to the first amended petition.

[2] This individual's name is spelled "Hanes" in the transcript of the 9/25/03 hearing, however, it is apparent from the rest of the record that the correct spelling is "Hines."

1   parole date passed in either 1988 or 1989.[3]

2          On September 25, 2003, the Board of Prison Terms ("Board") conducted

3   petitioner's twelfth subsequent parole suitability hearing and determined for the first time that he

4   would not pose an unreasonable risk of danger to society or a threat to public safety if released,

5   and thus that he was suitable for parole.  In a written decision dated February 20, 2004, Governor

6   Schwarzenegger reversed the Board's grant of parole.  Petitioner sought habeas corpus relief in

7   the Los Angeles County Superior Court.  After concluding in a reasoned decision that no

8   evidence supported the Governor's conclusion that petitioner was unsuitable for parole, the

9   superior court granted the writ, vacated the reversal and reinstated the Board's decision to grant

10   petitioner parole.  The California Court of Appeal, Second District, stayed the superior court's

11   order pending appeal.  Ultimately, the state appellate court disagreed with the superior court, and

12   reinstated Governor's Schwarzenegger's reversal of the Board's parole grant.  Petitioner sought

13   further review in the California Supreme Court; relief was denied on March 1, 2006.

14          III.  LEGAL STANDARD FOR FEDERAL HABEAS CORPUS

15          An application for writ of habeas corpus by a person in custody under judgment of

16   a state court can be granted only for violations of the Constitution or laws of the United States.

17   28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

18   *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

19   This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,

20   the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521

21   U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under

22   AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

23   state court proceedings unless the state court's adjudication of the claim:

24

25       [3] According to the first amended petition, petitioner's minimum eligible parole date was
     October 13, 1989; the Board recited at the September 25, 2003 hearing that his minimum eligible
26   parole date passed on February 2, 1988.

(1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the
State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*
*Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).
This court will look to the last reasoned state court decision to determine whether the law applied
to petitioner's due process claim was contrary to the law set forth in the cases of the United
States Supreme Court or whether an unreasonable application of such law has occurred. *See*
*Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919 (2003).

IV.  ANALYSIS OF THE DUE PROCESS CLAIM

A.     Applicable Federal and State Law

The Due Process Clause of the Fourteenth Amendment prohibits state action that
deprives a person of life, liberty, or property without due process of law.  A person alleging a due
process violation must first demonstrate that he or she was deprived of a protected liberty or
property interest, and then show that the procedures attendant upon the deprivation were not
constitutionally sufficient.  *Kentucky Dep't. of Corrections v. Thompson*, 490 U.S. 454, 459-60
(1989); *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

A protected liberty interest may arise from either the Due Process Clause itself or
from state laws.  *Board of Pardons v. Allen*, 482 U.S. 369, 373 (1987).  The United States
Constitution does not, in and of itself, create a protected liberty interest in receipt of a parole
date. *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981).  Where a state's statutory parole scheme
uses mandatory language, however, that state statute "creates a presumption that parole release
will be granted" when or unless certain designated findings are made, thereby giving rise to a
constitutional liberty interest. *McQuillion*, 306 F.3d at 901 (*quoting Greenholtz v. Inmates of*
*Nebraska Penal*, 442 U.S. 1, 12 (1979)).  The Ninth Circuit Court of Appeals has held that

4

1    California state prisoners who have been sentenced to prison with the possibility of parole have a

2    clearly established, constitutionally protected liberty interest in receipt of a parole release date.

3    *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (*citing Sass v. Cal. Bd. of Prison Terms*,

4    461 F.3d 1123, 1128 (9th Cir. 2006)); *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir. 2003);

5    *McQuillion*, 306 F.3d at 903; and *Allen*, 482 U.S. at 377-78 (*quoting Greenholtz*, 442 U.S. at

6    12)).

7              The full panoply of rights afforded a defendant in a criminal proceeding is not

8    constitutionally mandated in the context of a parole proceeding.  *See Pedro v. Or. Parole Bd.*,

9    825 F.2d 1396, 1398-99 (9th Cir. 1987).  The Supreme Court has held that a parole board's

10    procedures are constitutionally adequate if the inmate is given an opportunity to be heard and a

11    decision informing him of the reasons he did not qualify for parole.  *Greenholtz*, 442 U.S. at 16.

12              Additionally, as a matter of *state* constitutional law, denial of parole to California

13    inmates must be supported by "some evidence" demonstrating future dangerousness.  *Hayward v.*

14    *Marshall*, No. 06-55392, slip op. at 34-35 (9th Cir. April 22, 2010) (en banc) (citing *In re*

15    *Rosenkrantz*, 59 P.3d 174, 210 (Cal. 2002), *In re Lawrence*, 190 P.3d 535, 549 (Cal. 2008), and

16    *In re Shaputis*, 190 P.3d 573, 582 (Cal. 2008)).  The federal Due Process Clause requires, in turn,

17    that California comply with its own quantum of evidence requirement.  *See Hayward v.*

18    *Marshall*, No. 06-55392, (Berzon, J., concurring in part and dissenting in part at 13).

19              The analysis of whether some evidence supports denial of parole to a California

20    state inmate is framed by the state's statutes and regulations governing parole suitability

21    determinations.  *See Irons*, 505 F.3d at 851.  This court "must look to California law to determine

22    the findings that are necessary to deem [a petitioner] unsuitable for parole, and then must review

23    the record to determine whether the state court decision holding that these findings were

24    supported by 'some evidence' [ ] constituted an unreasonable application of the 'some evidence'

25    principle."  *Id.*

26    /////

Title 15, Section 2402 of the California Code of Regulations sets forth various factors to be considered by the Board in its parole suitability findings for murderers.  The regulation is designed to guide the Board's assessment of whether the inmate poses "an unreasonable risk of danger to society if released from prison," and thus whether he or she is suitable for parole.  *In re Lawrence*, 44 Cal.4th 1181, 1214, 1202 (2008).  The Board is directed to consider all relevant, reliable information available regarding

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

15 Cal. Code Regs. § 2402(b).  The regulation also lists several specific circumstances which tend to show suitability or unsuitability for parole.  15 Cal. Code Regs. § 2402(c)-(d).  The overriding concern is public safety and the focus is on the inmate's *current* dangerousness.  *In re Lawrence*, 44 Cal. 4th at 1205.  Thus, the proper articulation of the standard of review is not whether some evidence supports the reasons cited for denying parole, but whether some evidence indicates that a parolee's release would unreasonably endanger public safety.  *In re Shaputis*, 44 Cal.4th 1241, 1254 (2008).  In other words, there must be some rational nexus between the facts relied upon and the ultimate conclusion that the prisoner continues to be a threat to public safety. *In re Lawrence*, 44 Cal. 4th at 1227.

### B.   The Board's Decision

The panel of the Board which presided over petitioner's 2003 parole suitability hearing relied on several factors in finding him to be suitable for parole.  The presiding commissioner indicated:

> We're finding you suitable for parole and I'll explain our reasons. We have reviewed all information received from the public and relied on the following circumstances in concluding that you would

6

1    not -- that you will not be an unreasonable risk of danger to society
     or a threat to public safety and are suitable for parole.  While
2    imprisoned, you've enhanced your ability to function within the
     law upon release through participation in self-help, education
3    programs, vocational programs, and institutional job assignments.
     You have been in AA, the Violence Prevention Program, VORG,
4    Anger Management, and your work reports have been exceptional.
     You've done everything that's been asked of you.  Because of
5    maturation, growth, greater understanding, and advanced age,
     you've reduced your probability of recidivism.  You have realistic
6    parole plans, which include family support and a residence.  You
     have maintained close family ties while imprisoned via letters,
7    visits, and phone calls.  And [you] have recently maintained
     positive institutional behavior, which includes -- which indicates a
8    significant improvement in self-control.  And you do show signs of
     remorse.  You did indicate that you understand the nature and the
9    magnitude of the offense and accepts responsibility for the criminal
     behavior and has a desire to change towards good citizenship (sic).
10   The psychological evaluation, which is dated June 24th, 2003, by
     John Rouse, R-O-U-S-E, is positive.  In that, under the Assessment
11   of Dangerousness, the doctor basically states that the inmate has
     less than average -- or rather, I should say, potential for
12   dangerousness of being less than an average inmate.  In addition,
     the Correctional Counselor, dated 6/11/03, by initial E. Lee, L
13   double E, indicates a degree of threat as low.  The psychologist
     evaluation also indicates that the Board would foresee that this
14   inmate should be (indiscernible) to factors of his parole rather than
     any mental issue -- mental health issues.  He has not -- he has no
15   diagnosis or (indiscernible) pathology -- psychopathology, which
     was related to his life crime.  He has never been diagnosed as
16   having a significant mental disorder, nor has he made any
     complaints of a mental disorder.  We do indicate you have a
17   limited history of violent type behavior and the life crime appears
     to have been situationally related...  The following [are] conditions
18   of parole: Do not use/possess alcoholic beverages.  Submit to
     alcohol testing.  Submit to anti-narcotic testing.  Submit to THC
19   testing and participate in a substance abuse program, such as AA
     and NA.  These special conditions are being implied since the
20   inmate has admitted being a heroin [addict] at one time and also
     [to] having an alcohol problem at one time.  Mr. Hodge, I got
21   pretty rough with you in regards to the crime and what -- the
     statements you've made.  We went back and read a lot of reports.
22   And the basic -- the basis of this whole -- this whole situation is
     that a baseball bat, although it is not mentioned in the POR and
23   was not mentioned, as you say in court, was mentioned by
     witnesses in the initial police report.  The picture that we're talking
24   about was a picture frame that the victim, Mr. Allen, took out of
     (indiscernible) house, Ms. Hoff's house, after dropping off boxes
25   of marijuana for her to sell, apparently, to get her husband out of
     jail.  He has this picture under his arm as he walked into the street.
26   There is no doubt in my mind that the altercation occurred between

                                     7

the two women out in the street and the injuries were a lot more severe than we thought. I mean, we're talking about one lady who was stabbed in the shoulder and the back, who needed stitches. And the other one had a lamp thrown on her head and wound up having stitches on her head. But primarily, Mr. Allen, whether he intended to or didn't intend to, did have a picture under his arm. The picture was somewhat destroyed during the altercation, which would mean to me it was more than just dropped. Which it could have been used to defend himself or to maybe attack somebody. Maybe the bat hit. There is no doubt in my mind neither that the bat was, in fact, the weapon used to strike the victim. You've been in -- you've been down for 24 years and there's no doubt in my mind also that very possibly you might forget some of this story. You have to live with it 24 hours a day, seven days a week. You did indicate, and there is no doubt in my mind, that the bat was thrown over the fence and then you said it was the picture thrown over the fence. The picture was, in fact, found thrown over a fence with the (indiscernible). And we're not talking about a picture frame as I might have thought. We're talking about, probably a painting in a frame. It talks about the painting being partially removed from the frame. Regardless, our quandary, is, if we denied you parole today, what would we ask you to do? Remain disciplinary free for another year? You've done that for 24 years. I can't think of a single thing to ask you to do if we deny you for parole, except more time. I think you've done enough, 24 years. That does conclude the reading of the decision.

(Exhibit 13, Subsequent Parole Consideration Hearing, September 25, 2003 at 59-63.)

       C.     The Governor's Reversal

       In his written review dated February 20, 2004, Governor Schwarzenegger likewise noted the positive factors for petitioner's release:

Mr. Hodge has been incarcerated now for 25 years, and he has served his time quite well. He has been free of any serious discipline action for his entire prison period. Mr. Hodge also has earned his GED and upgraded himself vocationally by becoming proficient in dry-cleaning, tailoring and laundry. He has maintained and advanced these skills through his steady work in the Prison Industry Authority. He has availed himself of self-help and therapy programs, including intermittently attending Alcohol Anonymous and Narcotics Anonymous. There is some indication in the record that Mr. Hodge additionally participated in Anger Management and the Victim/Offender Reconciliation Group. He has received favorable psychological, work, and counseling evaluations. I commend Mr. Hodge for bettering himself and enhancing his ability to function within the law upon release. His prison conduct demonstrates his gained maturity, responsibility and

1      self-control.

2  (Exhibit 14, Indeterminate Sentence Parole Release Review, February 20, 2004 at 1-2.)

3      Ultimately, however, the Governor determined that petitioner was not suitable for

4  parole.  He began by summarizing petitioner's criminal history:

> Mr. Hodge's criminal conduct began when he was a child in Ohio. Beginning at age 14, he was found responsible for several theft-related crimes and spent time in and out of a boys detention home and on probation in Ohio.  As an adult, Mr. Hodge was arrested more than 25 times and convicted more than 10 for mostly theft-related crimes.  From age 19 to 38, Mr. Hodge was on and off probation and in and out of county jails in Ohio.  When he beat Mr. Allen to death, he was on probation in Ohio and had absconded from that state.  Mr. Hodge had no significant record of violence or assaulting others at the time.

(Ex. 14, Indeterminate Sentence Parole Release Review, February 20, 2004 at 1.)  The Governor went on to describe how petitioner's pre-prison history painted a picture very different from that of his in-prison conduct:

> In addition to his many criminal entanglements, Mr. Hodge admits to considerable drug abuse for approximately 10 years, during which time he was addicted to heroin and overdosed twice.  He also admits to being unemployed for much of his life and to supporting himself and his drug habits by gambling and stealing.
>
> According to various psychological reports, Mr. Hodge asserts that he comes from a large family consisting of more than 20 half-siblings, and he has somewhere between five and seven children resulting from multiple relationships.  Although he has not maintained direct contact with many family members, he has maintained ties with several siblings and cousins and has established other relationships via letters.  As for his parole plans, he has a confirmed housing offer from the Salvation Army, which may also assist him with employment counseling.  But Mr. Hodge does not have a job offer or even a solid employment plan.  In 2001, and again in 2002, the Board denied parole to him partly because of his lacking employment plans.  I recognize that Mr. Hodge is 63 years old- and statistically has a reduced probability of recidivism due to his age- but he needs to have a solid plan for supporting himself.  Mr. Hodge had no documented employment record when he entered prison, and he stated at his 2003 parole hearing that he is not expecting any social-security or other financial support upon release.  Mr. Hodge is proficient in dry-cleaning, laundry and tailoring- and the record before me indicates

he is physically capable of working in these fields.  He is assigned to and has been working in the Prison Industry Authority laundry since October 1997.  A recent Life Prisoner Evaluation mentions Mr. Hodge may plan to contact the Employment Development Department upon being paroled.  This is something- but it is not enough.  Mr. Hodge was unemployed and living unstably when he killed Mr. Allen.  Without a way to provide for himself, the odds that he will slip back into the only lifestyle he knows outside of prison- crime, drugs and gambling- are increased.  Since Mr. Hodge's lifestyle played a role in Mr. Allen's murder, if he were to return to his old ways, the public would be at risk.

Mr. Hodge committed a serious, violent crime.  He charged Mr. Allen- a man who had nothing more than a picture frame in his hand at the time- with a baseball bat and then used it to brutally abuse him.  Mr. Hodge hit Mr. Allen two times in the head, hard enough to knock him to the ground and ultimately kill him.  While understand the picture frame was possibly a converted window frame and was quite large, Mr. Hodge's reason for hitting Mr. Allen- let alone doing so with deadly force- does not make sense. He claims that he saw Mr. Allen swinging the frame and feared that Mr. Allen was going to hit his girlfriend with it.  Even if this were true, we are talking about a frame described by Mr. Hodge at his 2003 hearing as being wooden and two or three feet in size. Whaling lethally on Mr. Allen with a baseball bat was hardly an appropriate response.  Mr. Hodge's act was not one of chivalry to protect his girlfriend, it was senseless, brutal murder.

Mr. Hodge over the years has recited different versions of what actually happened in the street the morning he attacked Mr. Allen. He pled not guilty to the murder charge, and he denied at trial that he knew anything about a baseball bat.  He now admits to using a baseball bat during the attack.  This is progress.  But when Mr. Hodge was asked by the Board at his 2003 parole hearing why he did not testify truthfully at trial about the murder weapon, Mr. Hodge summed it up as "a misunderstanding."  Mr. Hodge's "misunderstanding" continued for nearly 10 years- since it was not until 1988 when he first admitted to using a bat.  Moreover, when the Board questioned Mr. Hodge about his believability, given the dramatic change in his story since trial, he responded by saying "[y]you can believe it or not."  Mr. Hodge continues his attempts to evade responsibility and to explain away or dismiss his previous lies.

Moreover, I would be remiss not to note that in 1998, an evaluator used "sociopath" to describe Mr. Hodge.  Also Mr. Hodge admitted at this 2003 hearing that he has not participated in Alcoholics Anonymous or Narcotics Anonymous since 2001. Notably, psychological reports in the record suggest that Mr. Hodge may be unpredictable if he uses alcohol or drugs.

The 2003 psychological assessment of Mr. Hodge made a one-sentence conclusion that he accepts culpability for his crime.  I note that, in addition to telling psychological staff and the Board at his parole hearings that he takes responsibility for killing Mr. Allen, Mr. Hodge in 1996 wrote an apology letter intended for the victim's family.  In his less-than two-page letter, he acknowledged his regret, said he was sorry for his actions and emphasized his hope for forgiveness by the family.  I question the evaluator's one-sentence finding- and Mr. Hodge's sincerity when he says that he fully accepts, understands, and is sorry for this murder.  As I discussed above, Mr. Hodge has given multiple versions of what happened the day Mr. Allen was fatally abused.  His credibility is shaky, at best.  Aside from his own statements, I see insufficient evidence in the record to support a conclusion that Mr. Hodge has really accepted full responsibility for what he did.  In 1999, when Mr. Hodge was asked by a psychologist whether he had participated in the Victim/Offender Reconciliation Group, Mr. Hodge said, "that's for people with violent problems.  I'm not violent."  When the psychologist reminded Mr. Hodge that his crime was certainly one of violence, he said, "well the crime was yeah, but they didn't believe my story that I hit somebody just in a fight."  Likewise, in a different writing, Mr. Hodge scribed another eight pages to "put the nature of [his] offense in a better perspective and to show that the degree of [his] guilt was blown out of proportion..."  This "continuation" - as Mr. Hodge called it - is not dated but notes within it an earlier writing dated April 1995.  It illustrates Mr. Hodge's minimization of his criminal conduct, and it clearly was written either shortly before or after the 1996 letter to the Allen family.  Given the record before me, I simply am unsatisfied that Mr. Hodge has accepted full responsibility for his crime.  I also am unconvinced that he considers what he did - attacking and killing a man - as serious as it is.  On this factor alone, I could conclude that Mr. Hodge would pose a risk of danger if released at this time.

Mr. Hodge committed an atrocious crime, which followed years of unremitting criminal behavior and instability.  The Long Beach Police Department opposes his parole, calling the murder merciless and a blatant disregard for human life.  The Department further emphasized that Mr. Hodge was on probation at the time he committed his crime.  The Los Angeles District Attorney's Office also opposes parole for Mr. Hodge, opining that he is developing the final version of his story and needs to take full responsibility for his crime.  That office also referenced his "horrendous" criminal history and lacking parole plans.

Mr. Hodge was 39 years old when he committed this crime- and he has come a long way since then.  He should be proud of his progress.  But Mr. Hodge has failed to benefit from society's previous attempts to correct his criminality.  And sadly, I am not satisfied that this 63-year-old man has demonstrated that his

1       institutional gains are sufficiently established to assure that his
success within prison will transfer outside of prison. After
2       carefully considering each of the factors the Board is required to
consider, I believe Mr. Hodge would pose an unreasonable risk to
3       public safety if paroled at this time. Accordingly, I REVERSE the
Board of Prison Terms' decision to parole Mr. Hodge.

4

5 (Exhibit 14, Indeterminate Sentence Parole Release Review, February 20, 2004 at 2-4.)

6            D.     Superior Court Grant of Habeas Corpus

7         As set forth above, the Los Angeles County Superior Court granted petitioner's

8 application for writ of habeas corpus after concluding that no evidence supported the Governor's

9 determination that petitioner was unsuitable for parole:

10       The Governor is constitutionally authorized to make an
"independent decision" as to parole suitability. (*In re Rosenkrantz*
11       (2002) 29 Cal. App.4th 1299, *see* Cal. Code Regs., tit. 15, §2402.)
However, the Governor's decision must be supported by a
12       "modicum of evidence." (*Id*. at 676.) Here there is no evidence to
support the Governor's conclusion that Petitioner is unsuitable for
13       parole.

14       The Governor concluded Petitioner was unsuitable for parole based
upon the gravity of the commitment offense, his failure to take
15       responsibility for the crime, his past criminal history, a serious
drug abuse history, and Petitioner's lack of employment plans.

16

17       The record reflects Petitioner was inside of a dwelling where a
violent physical altercation occurred between two other occupants,
18       one of which was Petitioner's girlfriend. The combatants then
carried the fight outside and the victim, who was walking across
19       the street, sought to intervene. Someone yelled and Petitioner
came out of the house with a baseball bat. Petitioner confronted
20       the victim and struck him twice in the head with the bat. Petitioner
fled and the victim died four days later from his injuries. Thus,
21       there is no evidence in the record that the circumstances of the
commitment offense were "especially heinous, atrocious, or cruel."
22       (Cal. Code Regs., tit. 15, §2402 (c)(1).)

23       The record also reflects that Petitioner had a significant criminal
history prior to the commitment offense. However, the majority of
24       Petitioner's prior convictions are property related offenses. There
is no evidence he has a previous record of violence. (Cal. Code
25       Regs., tit. 15, §2402(c)(2).) Likewise, the record established that
Petitioner had a serious drug abuse history prior to his
26       incarceration for the commitment offense. However, there is no
evidence Petitioner has continued to abuse substances over the last

1    twenty-four years of incarceration and a prisoner's prior addiction
     is not an appropriate consideration in determining parole
2    suitability.  (*In re Smith* (2003) 109 Cal.App.4th 489, 505.)

3    The Governor also concluded Petitioner lacks realistic employment
     plans.  (Cal. Code Regs., tit. 15, §2402(d)(8).)  However, the
4    record reflects Petitioner has gained marketable skills since his
     incarceration and at least one of the residential programs Petitioner
5    has been invited to participate in offers assistance with vocational
     training and job placement.  Therefore, there is no evidence
6    Petitioner lacks realistic parole plans.

7    Lastly, the Governor cited inconsistencies in Petitioner's version of
     the events of the life crime over the years as evidence Petitioner
8    has not fully accepted responsibility for the crime, and therefore
     lacks remorse.  (Cal. Code Regs., tit. 15, §2402(d)(3).)  An inmate
9    may not be required to admit guilt in order to be found suitable for
     parole.  (Penal Code §5011(b).)  However, if guilt is uncontested,
10   as it is here, the Governor may properly consider Petitioner's
     attitude toward the crime and his lack of remorse and
11   understanding of the nature and magnitude of the offense.  (*In re
     McClendon* (2003) 113 Cal. App. 4th 315, 322.)  When Petitioner
12   was interviewed in 1979 for the pre-sentence report, he denied any
     involvement in the commitment offense.  He apparently did not
13   even admit to having used a baseball bat as a weapon until 1988.
     However the record reflects the Board questioned Petitioner
14   extensively about the circumstances of the commitment offense
     and Petitioner's version of it during the most recent suitability
15   hearing.  Petitioner admitted to the Board that he lied in court when
     he said he did not have a baseball bat.  Further, during the hearing
16   he admitted to striking the victim in the head with the bat.
     Therefore, while it is true Petitioner has at times been, admittedly
17   untruthful, the Governor's conclusions are based upon statements
     made at the least fifteen years ago, and at the most, twenty-four.
18   That coupled with a positive psychological evaluation, a record
     free of serious misconduct, and participation in self-help
19   programming, contradicts the Governor's conclusion.  There is no
     evidence in the record that Petitioner does not currently understand
20   the nature and magnitude of the commitment offense.  (*Id.*)

21   Therefore, the Governor is ordered to vacate the February 20, 2004
     decision, and the Board's decision to grant parole is reinstated.
22   The Governor, in his discretion, may issue a new decision pursuant
     to his authority under Article V, §8(b) of the California
23   Constitution and Penal Code §3041.2.  (*Capistran supra*, at 1307.)

24   (Exhibit 15, BH 002650 opinion at 1-3 (footnotes omitted).)

25   /////

26   /////

13

1          E.          California Court of Appeal's Reversal

2          In finding that some evidence supported the Governor's reversal of petitioner's

3    grant of parole, the California Court of Appeal, Second District, identified and examined six

4    distinct factors or circumstances relating to parole suitability, concluding that each one

5    constituted some evidence that he was unsuitable for parole.  The factors or circumstances

6    examined include (1) gravity of the offense; (2) minimization of the offense; (3) lack of remorse;

7    (4) parole plans; (5) unstable lifestyle; and (6) opposition by the Long Beach and Los Angeles

8    Police Departments.

9          1.          Gravity of the offense

10          A prisoner's commitment offense tends to show an inmate's unsuitability for

11    parole where committed in "an especially heinous, atrocious or cruel manner."  15 Cal. Code

12    Regs. § 2402(c)(1).  The facts of a commitment offense can alone be a sufficient basis for

13    denying parole where they are especially heinous or particularly egregious.  *In re Rosenkrantz*, 29

14    Cal.4th 616, 682 (2002); s*ee also Biggs v. Terhune*, 334 F.3d 910, 913-16 (9th Cir. 2003); *Sass v.*

15    *Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1126 (9th Cir. 2006); *Irons v. Carey*, 505 F.3d 846,

16    852-53 (9th Cir. 2007).  The Ninth Circuit has cautioned in dicta, however, that repeated denial

17    based solely on an inmate's commitment offense "will at some point violate due process" where

18    there is evidence of rehabilitation and the prisoner has served the minimum term on his sentence.

19    S*ee Irons*, 505 F.3d at 853-54.

20          Under section 2402(c)(1), the circumstances that support a finding that a prisoner

21    committed an offense in an especially heinous or cruel manner include that (A) multiple victims

22    were attacked, injured or killed; (B) the offense was carried out in a dispassionate and calculated

23    manner, such as an execution-style murder; (C) the victim was abused, defiled or mutilated; (D)

24    the offense was carried out in a manner which demonstrates an exceptionally callous disregard

25    for human suffering;  and (E) the motive for the crime is inexplicable or very trivial in relation to

26    the offense."  15 Cal. Code Regs. §2402 (c)(1)(A)-(E).  The relevant inquiry is an individualized

one: "whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense." *In re Lawrence*, 44 Cal.4th at 1221.  The passage of time and attendant changes in the inmate's psychological or mental attitude are relevant considerations.  *Id.*

Here, the state appellate court found there was some evidence that petitioner was unsuitable for parole based on the gravity of his commitment offense because the offense showed an exceptionally callous disregard for human suffering and because the motive was trivial relative to the offense.  *See* Cal. Code Regs. tit. 15 §2402(c)(1)(D)-(E).  These terms have been applied by the California courts as follows:

> A prisoner's commitment offense may constitute a circumstance tending to show that a prisoner is presently too dangerous to be found suitable for parole, but the denial of parole may be predicated on a prisoner's commitment offense only where the Board can "point to factors beyond the minimum elements of the crime for which the inmate was committed" that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released. [In re] Dannenberg, 34 Cal.4th [1061] at 1071, 23 Cal.Rptr.3d 417, 104 P.3d 783 (Cal.2005).  Factors beyond the minimum elements of the crime include, *inter alia*, that... "[t]he offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering," and that "[t]he motive for the crime is inexplicable or very trivial in relation to the offense."  Cal.Code Regs., tit. 15 §2402(c)(1)(D)-(E)."

*Irons*, 505 F.3d at 851-51.

In California, "[s]econd degree murder is defined as the unlawful killing of a human being with malice aforethought, but without the additional elements-- i.e., willfulness, premeditation, and deliberation- that would support a conviction of first degree murder." *People v. Nieto Benitez*, 4 Cal.4th 91, 102 (1992).  "Such malice may be express or implied.  It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.  It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." *People v.*

15

*Mattison*, 4 Cal.3d 177, 182 (1971) *citing* Cal. Penal Code § 188.

Under California law:

> all second degree murders by definition involve some callousness-
> i.e., lack of emotion or sympathy, emotional insensitivity,
> indifference to the feelings and sufferings of others. [Citation.] As
> noted, however, parole is the rule, rather than the exception, and a
> conviction for second degree murder does not automatically render
> one unsuitable... Therefore, to demonstrate "an exceptionally
> callous disregard for human suffering" (§ 2402, subd. (C)(1)(D)),
> the offense in question must have been committed in a more
> aggravated or violent manner than that ordinarily shown in the
> commission for second degree murder.

*In re Scott*, 119 Cal.App.4th 871, 891 (1st Dist. 2004). Such aggravated circumstances may include torture, severe trauma, as where "[d]eath resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim" (*Id*. at 892), "rehearsing the murder, execution of a sleeping victim, stalking," (*see In re Weider*, 145 Cal.App.4th 570, 589 (6th Dist. 2006)), or where there is evidence that the defendant "acted with cold, calculated, dispassion; or... gratuitously increased or unnecessarily prolonged [the victim's] pain and suffering" (*In re Smith*, 114 Cal.App.4th 343, 367 (6th Dist. 2003)).

Similarly, a finding of "triviality" sufficient to justify the denial of parole must also relate to an inmate's current dangerousness:

> The offense committed by most prisoners serving life terms is, of
> course, murder. Given the high value our society places upon life,
> there is no motive for unlawfully taking the life of another human
> being that could not reasonably be deemed "trivial." The
> Legislature has foreclosed that approach, however, by declaring
> that murderers with life sentences must "normally" be given
> release dates when they approach their minimum eligible parole
> dates. (Pen. Code, § 3041, subd. (a).) The governing statute also
> states that the Board shall set a release date "unless it determines
> that the gravity of the current or past convicted offense or offenses,
> is such that consideration of the public safety requires a more
> lengthy period of incarceration for this individual, and that a parole
> date, therefore, cannot be fixed at this meeting." (Pen. Code, §

16

3041, subd. (b).)  This language means "a more lengthy period of incarceration" is called for where the gravity of the offense or offenses of the prisoner in question is more indicative of a danger to the public if the prisoner is released than would ordinarily be the case.  The reference in Board regulations to motives that are "very trivial in relationship to the offense" therefore requires comparisons; to fit the regulatory description, the motive must be materially less significant (or more "trivial") than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily presented.

*In re Scott*, 119 Cal.App.4th at 893.

Here, the court of appeal specifically held, with respect to the Governor's consideration of petitioner's commitment offense:

[E]ven if force was necessary to protect Hines, nothing in the record demonstrates Hodge was required to resort to deadly force and the fact Hodge struck Allen twice in the head with the baseball bat demonstrates his disregard for human suffering.  Further, the Governor could conclude Hodge's motive in killing Allen, i.e., preventing Allen's intervention in the fight between Hoff and Hines, was trivial relative to the offense.

Additionally, even accepting Hodge's version of Allen's murder as true, the Governor properly could conclude Hodge demonstrated callous disregard for human suffering by failing to stop the fight in the front yard, despite Hoff's visible injuries.  Instead, Hodge escalated the situation by obtaining a baseball bat, which he used to trike Allen twice in the head, causing his death.  *Dannenberg, supra*, specifically held multiple blows to the head may render a murder egregious based on extreme and substantial violence, thereby exceeding the minimum conduct necessary for a conviction of the life offense.  (*In re Dannenberg, supra*, 34 Cal.4th at p. 1095.)

Finally, under Penal Code section 3041, subdivision (b), the timing and gravity of current or past offenses is a consideration in parole determinations.  Here, rather than complete his probation obligation in Ohio, Hodge absconded to California where he engaged in a variety of criminal behavior which continued even after the murder of Allen.  Also, Hodge disposed of the murder weapon and fled with Hines to San Diego, postponing his eventual arrest in this case.  Flight from the scene of the crime, which is viewed as conduct "affirming [the] violent act," can be considered a factor in determining whether an [offense] is more egregious than the statutory minimum necessary for a conviction.  (See *In re Rosenkrantz, supra*, 29 Cal.4th at p. 683.)

17

> In sum, review of the record reveals some evidence supports the Governor's conclusion that Hodge's offense was committed with an exceptionally callous disregard for human suffering and the motive was trivial relative to the offense.

(Exhibit 16, B180414 opinion, November 14, 2005 at 13-14.)

Despite the state appellate court's conclusion, there is in fact no evidence that petitioner's offense was so heinous, atrocious, or cruel that it continues to be predictive of his current dangerousness this many years later, given the other facts in the record demonstrating significant rehabilitation and changes in his psychological and mental attitude. *See In re Lawrence*, 44 Cal.4th at 1221.

It is undisputed that (a) petitioner's offense arose out of a fight between his pregnant girlfriend and another woman, (b) the victim sought to intervene in the fight while wielding a large wooden window frame, and (c) petitioner killed the victim by striking him in the head either once or twice with a baseball bat.

These facts (in addition to the others recited by the court) do not support a finding that this offense was committed in an exceptionally aggravated or violent manner, compared to other second degree murders, due to an exceptionally callous disregard for human suffering or an extremely trivial motive, within the meaning of the relevant parole regulation. *See, e.g.*, *In re Rico*, 171 Cal.App.4th 659, 682-83 (2nd Dist. 2009) (no evidence of exceptionally callous disregard for human suffering where inmate did not "choose an especially painful or slow method for the killing, did not attempt to prolong or exacerbate the victim's suffering, did not terrorize, taunt, or torment the victim, and did not attempt to prevent him from obtaining aid"); *In re Roderick*, 154 Cal.App.4th 242, 266 (1st Dist. 2007) (escalation of a physical fight does not support a finding "that the motive for the murder was less significant than in other second degree murder cases"); *Saldate v. Adams*, 573 F.Supp.2d 1303, 1311-12 (E.D. Cal. 2008) (commitment offense, which arose out of a fight outside a 7-11 during which the inmate attacked and killed the victim by stabbing him multiple times after the victim began fighting with the petitioner's friend,

1  was not committed in an especially heinous, atrocious or cruel manner and did not constitute

2  some evidence of unsuitability for parole when such conduct occurred approximately 20 years

3  prior).

4  The California Court of Appeal cited *In re Dannenberg*, 34 Cal.4th at 1095, as

5  holding that multiple blows to the head may render a murder egregious based on extreme and

6  substantial violence, thereby exceeding the minimum conduct necessary for a conviction of the

7  life offense.  In *Dannenberg*, the inmate had "struck multiple blows to his wife's head with a

8  pipe wrench," and then either "placed her head in the water, or at least left it there without

9  assisting her until she was dead."  *Id*.  The *Dannenberg* court did not hold that multiple blows to

10  the head automatically render a murder especially egregious.  Even assuming, in this case, that

11  petitioner struck the victim in the head twice with the bat, that conduct did not show an

12  *exceptionally* callous disregard for human suffering, compared to the typical second degree

13  murder.

14  By statute, the "timing and gravity" of petitioner's commitment offense is a

15  proper consideration for his parole suitability determination.  It is not apparent, however, and

16  neither the Governor nor the court of appeal explained, how the fact that petitioner absconded

17  from a probation term in the 1970s in Ohio remained probative to a determination of his current

18  dangerousness at the time of the 2003 hearing.  *See In re Lawrence*, 44 Cal.4th at 1221.  The

19  timing of petitioner's offense does not, by itself, require a more lengthy period of incarceration in

20  this case.

21  Similarly, the fact that petitioner fled from the scene of the crime does not make

22  his offense especially aggravated for parole suitability purposes and does not constitute reliable

23  evidence probative to a determination of his current dangerousness.  The state appellate court

24  cited *In re Rosenkrantz*, 29 Cal.4th 616 at 673, as holding that flight from a crime scene "is

25  viewed as conduct 'affirming [the] violent act.'"  In *Rosenkrantz*, the inmate's commitment

26  offense was a fatal shooting with a newly purchased Uzi firearm.  After the murder, the inmate in

*Rosentkrantz* remained a fugitive for 24 days during which time he kept the loaded Uzi with him, posed with it for photographs, and contacted authorities on multiple occasions, making statements such as "I had to do it because he asked for it," and "nobody can fuck with me like that and get away with it." *In re Rosenkrantz*, 29 Cal.4th at 671. The inmate ignored pleas to turn himself in, stating that he wanted to just have fun "for a little while, then go and get chained up," and that "he did society a favor" by shooting the victim. *Id*. It is obvious how the inmate's conduct in *Rosenkrantz* "continued to affirm his violent act after it had occurred." In contrast, there is no evidence that the petitioner in this case engaged in conduct affirming Allen's murder during the time that he was on the run.

The state appellate court's contention that petitioner demonstrated callous disregard for human suffering by failing to stop the fight between the women, and instead escalating the situation, is also misguided. "The mere fact that there are a lot of other choices a person could have made," including "[t]hat a prisoner could have avoided his or her commitment offense," does not rationally support a finding that a crime was committed in an especially heinous, atrocious or cruel manner." *In re Roderick*, 154 Cal.App.4th at 266. Moreover, the proper question for analysis is whether the *murder* demonstrated callous disregard for human suffering, not whether petitioner's conduct in failing to stop the fight between Hines and Hoff did so.

In considering the circumstances of petitioner's commitment offense, both the Governor and the state appellate court ignored strong evidence in the record which undermined their chosen conclusion with respect to this factor. For example, reliance on petitioner's commitment offense to deny parole ignores the repeated findings by psychologists that his crime was situationally related and uncharacteristic of him. (*See*, *e.g.*, Exhibit 22, Psychological Evaluation for the Board of Prison Terms, July 2003 ("this offense appeared to be out of character for Mr. Hodge who had no history of violence prior" and "Mr. Hodge has a limited history of violent type behavior and the life crime appears to have been situationally related.");

1   Exhibit 23, Category X Psychological Evaluation, September 1990 (stating that the offense was

2   "quite an uncharacteristic show of aggression").)  Reliance on the commitment offense also

3   ignores petitioner's consistent exemplary conduct in prison over more than two decades (*see*,

4   *e.g.*, Exhibit 20, Psychological Evaluation for the Board of Prison Terms, February 1998 ("Prison

5   adjustment has been exemplary."); Exhibit 21, Life Prisoner Evaluation Report, January 1993

6   Calendar (characterizing petitioner as a "Model Inmate")), and the fact that multiple evaluators

7   have indicated that petitioner no longer poses a danger to society (*see*, *e.g.*, Exhibit 22,

8   Psychological Evaluation for the Board of Prison Terms, July 2003 at 4) ("It is the opinion of this

9   examiner that his risk of dangerousness is less than that of the average inmate incarcerated here

10   at CSP-Solano and would be expected to be so over the course of the next years."); Exhibit 24,

11   Psychosocial Evaluation for the Board of Prison Terms, October 2000 ("He presented with no

12   particular impulse, emotional control, attitude or anger dyscontrol that would give one pause in

13   assessing his level of dangerousness."); Exhibit 25, Life Prisoner Evaluation Report, August

14   2003 Calendar ("this writer believes the prisoner would pose a low degree of threat to the public

15   at this time, if released from prison"); Exhibit 27, Life Prisoner Evaluation Report, March 2002

16   Calendar (same); Exhibit 26, Life Prisoner Evaluation Report, May 2000 Calendar (same);

17   Exhibit 28, Life Prisoner Evaluation Report, March 1999 Calendar (same); Exhibit 21, Life

18   Prisoner Evaluation Report, January 1993 Calendar (same); Exhibit 29, Life Prisoner Evaluation

19   Report, February 1992 Calendar (same).)

20         Given all the evidence demonstrating significant rehabilitation and changes in

21   petitioner's psychological and mental attitude, it was unreasonable for the court of appeal to

22   conclude that his offense was so violent or aggravated that it remained probative, on its own, to

23   an assessment of his current dangerousness at the time of the 2003 parole suitability hearing,

24   which was more than 24 years after the offense.  *See In re Lawrence*, 44 Cal.4th at 1221.  The

25   offense was not carried out with the type of gratuitous violence, torture or disregard for the

26   victim that would permit it to be defined as "especially callous" as that term has been defined and

applied by the California courts.  Similarly, there are no facts which suggest that the motive for

petitioner's actions was sufficiently trivial, such that 24 years later, its nature would still suggest

that he remained a danger to society.  Absent such facts, the "gravity" of petitioner's commitment

offense does not constitute some evidence that he is currently unsuitable for parole.

        2.      Minimization of the offense

        A prisoner's "past or present attitude toward the crime" is another factor properly

considered in a parole suitability determination.  15 Cal. Code Regs. § 2402 (b).

        The court of appeal held, with respect to the Governor's consideration of the

commitment offense:

> The Governor considered Hodge's continuing attempts to
> minimize the severity of his actions under the rubric of the
> prisoner's "past and present attitude toward the crime." (§ 2402,
> subd. (b).)  The Governor found Hodge did not understand the
> magnitude of his crime or appreciate the seriousness of his
> conduct.  The Governor's conclusion is supported by evidence
> indicating Hodge consistently has minimized his responsibility for
> Allen's death.  The Governor noted Hodge stated his guilt had been
> "blown out of proportion by the prosecution, and the truth was not
> brought to light at trial . . . ."  Hodge also expressed surprise at the
> jury's verdict stating, "all this over two women fighting."  A 1990
> evaluation of Hodge noted he "tends to minimize the intensity of
> his attack by claiming the weapon was part of a wooden window
> frame rather than a bat and that he only struck the victim once."
> Hodge denied using a baseball bat in the attack for 10 years and
> stated Allen's death was the result of "just" a fight.  In 1999,
> Hodge told a psychologist he was not violent and did not believe
> he was a candidate for the VORG.  Even at the current parole
> hearing, Hodge continues to minimize his responsibility for Allen's
> death.
>
> Finally, although the jury rejected Hodge's claim he attacked Allen
> to prevent Allen from harming Hines,[4] Hodge continues to assert
> he struck Allen only in defense of Hines.  The Governor cannot be
> faulted for taking the jury's view of the evidence, which
> demonstrates that Hodge continues to minimize his responsibility
> for Allen's murder.

---

[4] Petitioner points out that, despite the court of appeal's contention, the jury did not
"reject" his self-defense claim.  At trial, petitioner did not present to the jury his claim that he hit
Allen in self-defense or in defense of Hines; rather, he falsely claimed that he had left the scene
and was not there when Allen died.

1

> Thus, "some evidence" supports the Governor's conclusion Hodge
> does not understand the magnitude of his crime or appreciate the
> seriousness of his conduct (*In re Rosenkrantz*, *supra*, 29 Cal.4th at
> p. 658.)

2

3

4    (B180414 opinion at 14-15.)

5    Contrary to the conclusion of the court of appeal, there is no evidence that

6    petitioner has "consistently" minimized his responsibility or that he otherwise was unsuitable for

7    parole at the time of his hearing in 2003 because of minimization of the offense.

8    The Governor noted with respect to this factor that petitioner had "scribed another

9    eight pages to 'put the nature of [his] offense in a better perspective, and to show that the degree

10   of [his] guilt was blown out of proportion...'"  The pending petition better places this undated

11   written statement of petitioner's in context, as part of a letter he wrote "to show that the degree of

12   my guilt was blown out of proportion *by the prosecutor* and the truth was not brought to light at

13   trial, *because of my refusal to tell the truth of what really happen (sic) that night* and the false

14   testimonies of Miss Claire Hoff."  (Exhibit 31, Continuation of Letter, undated (emphasis

15   added).)  Petitioner then sets forth in the "continuation" facts consistent with what he testified to

16   at the parole hearing: that he went out with the baseball bat to defend Hines from Allen, who was

17   armed with the converted window frame; that Allen swung at him first; that he swung the bat and

18   hit Allen once on the head; and that Allen fell onto the street with a "sickening thud."

19   Petitioner first told the truth about his use of a bat in the offense in 1988.  The record

20   reflects that, since then, his version of the incident has remain unchanged.  This appears so,

21   despite the Governor's reference to "a 1990 evaluation of Hodge" which indicated he "tends to

22   minimize the intensity of his attack by claiming the weapon was part of a wooden window frame

23   rather than a bat and that he only struck the victim once."  This written statement in the 1990

24   evaluation in question (see Exhibit 33, Referral Questions, September 1990) appears to have

25   been based on *prior* statements made by petitioner.  As the pending petition points out, a

26   different, more extensive evaluation also dated September 1990 reveals that petitioner had by

then admitted to using the bat:

> [Hines] hit [Hoff] with a lamp.  They went outside.  About that time, [Allen] returned. [Hines] started hollering.  I came out and saw [Allen] swing a picture frame at [Hines].  I told him to knock it off.  He said, "Fuck you, punk."  I had a bat and I hit him, just once.  He fell and hit his head on the concrete.  I threw the bat in the yard.

(Exhibit 34, Category X Psychiatric Evaluation, September 1990 at 7-8.)

Petitioner cannot be required to admit guilt to his crime or some specific element thereof in order to be found suitable for parole.  *See* Cal. Penal Code § 5011(b) ("The Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed.")  Since 1988, petitioner has consistently indicated that Allen intervened in the fight between Hines and Hoff, swinging a large wooden frame at Hines, and that petitioner subsequently hit Allen once with the bat, causing him to fall and hit his head on the ground.  Petitioner should not be found unsuitable for parole because he refuses to accept all elements of the prosecution's version of events at trial (i.e., admit that he hit Allen twice).

The pending petition further asserts that petitioner's undated written statement regarding his guilt being "blown out of proportion by the prosecutor" likely resulted, in part, from the prosecution's offer of a manslaughter plea bargain before trial.  The petition persuasively argues that petitioner should not be found unsuitable for parole simply because he has expressed his belief that the theory of the case presented by the prosecution at trial and during appellate proceedings was overblown or exaggerated in light of the specific facts of the case and the original plea offer he received.  Importantly, petitioner blames himself, not the prosecutor, for the fact that his version of events was not placed before the jury.  (*See*, *e.g.*, Exhibit 35, Psychiatric Evaluation, October 3, 1992 ("He said none of these facts had come out at the hearing because of his refusal to admit the crime.").)

Although the Court of Appeal used the previously referenced September 1990 evaluation titled Referral Questions to conclude that petitioner remained a danger to society

because of minimization of his offense, the evaluation itself directly contradicted such a

conclusion.  Under the heading "Violence Potential," the evaluator wrote:

> [H]e is not an innately aggressive or assaultive individual, and this offense appears to be an isolated case.  It was a situationally based attempt to protect his pregnant common-law wife, not a predatory act.  In almost any other setting or conflict, he would be more inclined to compromise than fight.  He has matured in prison, has a constructive marriage, some vocational preparation and this, with his advancing age should predict that he will remain non-violent upon release.

(Exhibit 33, Referral Questions, September 1990 at 3.)  Despite its reference to what were most

likely petitioner's *previous* statements denying use of a bat, this report in no way suggested that

petitioner posed a current risk of danger to society because of minimization of the offense and

thus should not be used by the Governor as evidence that petitioner is unsuitable for parole.  *See*

*In re Weider*, 145 Cal.App.4th at 585 (rejecting reliance on discrete portion of psychological

evaluation indicating that inmate had "downplayed" the role of alcohol in his offense where the

overall report found that the inmate posed a low risk for future violence).

The court of appeal also cited evidence that petitioner had "expressed surprise at

the jury's verdict" stating, "all this over two women fighting."  Petitioner contends that this

statement was taken out of context, and that the entire paragraph from the relevant psychological

evaluation makes it clear that he was explaining his feelings *at the time of the jury verdict*:

> He reported that he was offered a plea bargain of manslaughter which he refused and went to trial.  He stated that the woman testified against him and that the "whole truth wasn't told."  He also expressed the opinion that he was not well represented.  The jury returned the verdict to which he was surprised, noting "all this over two women fighting."  When asked what he had learned in the subsequent years, he stated that he thought many times about what could have been done differently.  He said that probably he should have stayed in the room and not reacted so quickly to the two women fighting.

(Exhibit 30, Psychosocial Evaluation for the Board of Prison Terms, March 1999.)  It is

undisputed that the offense *did* arise, as an initial matter, out of two women fighting.  Petitioner's

statement to that effect could be nothing more than an expression of regret that he involved himself.  Petitioner has repeatedly accepted responsibility for the victim's death.  His reported statement in 1999, "all this over two women fighting," does not constitute some evidence of future dangerousness.

Petitioner's comment regarding the Victim/Offender Reconciliation Program ("VORG"), referenced by both the Governor and the state appellate court, is also troubling at first blush.  His indication that "[VORG is] for people with violent problems.  I'm not violent" certainly appears to minimize his conviction for second degree murder, which is of course by definition an extremely violent and serious crime.  Even this statement, however, considered in its context, is not evidence that petitioner continues to pose an unreasonable risk of danger to the public because of minimization of his offense.  It is undisputed that the underlying offense constitutes petitioner's only conviction for a violent crime; further he has no record for violence during his more than two decades in prison.  Importantly, petitioner *did* participate in VORG following the 1999 evaluation, and has also completed other programs designed for violent inmates.  (Exhibit 36, Approval of VORG Membership, January 25, 2000; Exhibit 22, Psychosocial Evaluation for the Board of Prison Terms, July 21, 2003 at 3 (stating that petitioner "has participated in a number of prosocial activities including Violence Prevention Program, VORG [and] Anger Management").)

The court of appeal held: "Even at the current parole hearing, Hodge continues to minimize his responsibility for Allen's death."  The Governor, in turn, indicates the following regarding petitioner's statements at the 2003 parole hearing:

> [W]hen Mr. Hodge was asked by the Board at his 2003 parole hearing why he did not testify truthfully at trial about the murder weapon, Mr. Hodge summed it up as 'a misunderstanding.'  Mr. Hodge's 'misunderstanding' continued for nearly 10 years- since it was not until 1988 when he first admitted to using a bat.  Moreover, when the Board questioned Mr. Hodge about his believability, given the dramatic change in his story since trial, he responded by saying, '[y]ou can believe it or not.'  Mr. Hodge continues his attempts to evade responsibility and to explain away

1        or dismiss his previous lies.

2   (Exhibit 14, Indeterminate Sentence Parole Release Review at 3.)  The quoted portion of the

3   transcript is as follows, in its entirety:

4            PRESIDING COMM:  You pled -- you pled not guilty.  You were
             found guilty by a jury trial.

5
             INMATE HODGE: Yes, Sir.  Yes, Sir.
6
             PRESIDING COMM: I didn't hear that.  And also, the guilty
7            verdict was upheld by the Appellate Court.

8            INMATE HODGE: Yes, Sir.

9            PRESIDING COMM: The story that you tell sounds to me like
             self-defense.  How did you get convicted of murder second degree?
10
             INMATE HODGE: Because I wouldn't -- I didn't tell the story.  I
11           got up and said -- I told of the fight but up until the part where it
             got to me, I said, I didn't -- I don't know nothing.  I -- we left.  I
12           wouldn't tell.

13           PRESIDING COMM: Well, why -- did you testify in court?

14           INMATE HODGE: Yes.

15           PRESIDING COMM: And you didn't tell them that story?

16           INMATE HODGE: No, Sir.

17           PRESIDING COMM: And why is that?

18           INMATE HODGE: I don't know myself.

19           PRESIDING COMM: Were you represented by Counsel?

20           INMATE HODGE: Yes.  And I was offered a manslaughter.

21           PRESIDING COMM: Did you -

22           INMATE HODGE: And I refused that too.

23           PRESIDING COMM: Did your Counsel know the true story?  Did
             you tell your counselor about the-
24           INMATE HODGE: No.
             PRESIDING COMM: Your legal counsel about (inaudible).
25
             INMATE HODGE: No, no.  Mr. Stanton, I believe was his name.
26

PRESIDING COMM: Why should we believe that story today if you didn't bring it up initially at the trial?

INMATE HODGE: (Inaudible) you want.  You can believe it or not.

PRESIDING COMM: I'm merely in a quandary to try to understand why you wouldn't bring that story forward, since it would indicate to me that it could be a possibility of self-defense.

INMATE HODGE: Because there ain't nobody to really see it.  There ain't nobody to see what happened, nobody but me.

PRESIDING COMM: Well, didn't the girl see it?

INMATE HODGE: No, she had run down the street (indiscernible).  I had to call her back.  And when she went to the arraignment, she told that -- she told what she saw.  But after she had got arrested before for assault, (indiscernible) some kind of deal with her or something that she saw everything.  You know, but I'm not going to argue the situation.  I can't blame her for saying what she said.

[...]

PRESIDING COMM: Do you remember your statements about the rape and robbery that you made to your probation officer?

INMATE HODGE: No.  What (inaudible)?  That was a long time ago.

PRESIDING COMM: You are Mr. Arbie Hodge, are you not?

INMATE HODGE: Yes, I am.

PRESIDING COMM: Page seven of the Probation Officer's report -- actually, it's page eight, starting on line one, Counsel.  Did you testify in court about the baseball bat?

INMATE HODGE: Yes.

PRESIDING COMM: (Indiscernible) lines 12 and 13, Mr. Ramos.  Okay, I want to get this straight now because we have an extreme variance obviously, in the stories you gave -- are giving today and the one that was contained in the POR.  Did you read your Probation Officer's report?

INMATE HODGE: Yes, I did.

PRESIDING COMM: You read that.

28

INMATE HODGE: I've got one. There ain't nothing in that, what you just said, I don't think.

PRESIDING COMM: Well, I'll tell you, and I will read it.

INMATE HODGE: Will you read it too?

PRESIDING COMM: This will be the defendant's statement and you are the defendant. And this says he knows nothing about a baseball bat.

INMATE HODGE: Repeat it?

PRESIDING COMM: He knows nothing about a baseball bat.

INMATE HODGE: On whatever -- what subject are we talking about? A baseball bat or a rape and robbery?

PRESIDING COMM: Well, both, because it says up here that she then left, went up to store. She got back and got into a fight. She came back with nothing (indiscernible). She then returned and said she had been raped and robbed.

INMATE HODGE: Oh yeah, because she said that.

PRESIDING COMM: Well, I asked you a moment ago, what about that, and you said you don't know anything about that.

INMATE HODGE: I don't . But that's what she said.

PRESIDING COMM: Okay. How about the baseball bat?

INMATE HODGE: Yeah. I had a baseball bat. At court I said no, I didn't.

PRESIDING COMM: That's what I'd asked you. Had you admitted having the baseball bat in court.

INMATE HODGE: I told them no, I didn't have the baseball bat. A misunderstanding somewhere.

PRESIDING COMM: Yes, a major misunderstanding.

INMATE HODGE: Okay.

(Ex. 13, Subsequent Parole Consideration Hearing, September 25, 2003 at 18-22.)

The two comments identified by the Governor from the above excerpt, "you can believe it or not" and "a misunderstanding somewhere," do not show on petitioner's part an

"attempt[] to evade responsibility and to explain away or dismiss his previous lies."  Petitioner

repeatedly acknowledged at the parole hearing that he had lied to the jury.  He explained his

motivation to do so, but did not attempt to justify his perjury.  The context of these two

statements shows that the Governor's conclusions based thereon are highly unreliable.  In

particular, petitioner's comment regarding "a misunderstanding somewhere" clearly referred to

repeated misunderstandings between the commissioner and petitioner, during their discussion of

factual issues.  Petitioner did not indicate that he viewed his lack of truthfulness before the jury

as a "misunderstanding."

Moreover, the portion of the parole hearing relied upon by the Governor did not

actually include any questions about acceptance of responsibility or minimization of culpability.

Thus,

> the answers upon which the Governor relies were taken out of their
> proper context. It so happened at the hearing that a Commissioner
> asked petitioner certain very fact-bound questions to which
> petitioner responded. The questions were not directly, or even
> subtly, seeking to elicit petitioner's conclusion about his
> responsibility for the killing, but were designed to clear up some
> factual issues in the Commissioner's mind.

*Tolliver v. Carey*, 2006 WL 3497670, 9 (E.D.Cal. 2006).  Here, petitioner's responses to the

Commissioner's factual questions in no way showed that he posed a current risk of danger based

on his past or present attitude toward his life crime and should not be relied upon by the

Governor, out of context, as evidence that petitioner is unsuitable for parole.

In contrast to the Governor's conclusion, which was in turn recited by the court of

appeal, the conclusion reached by psychological professionals is that  "Mr. Hodge accepted

culpability for his commitment offense."  (Exhibit 22, Psychological Evaluation for the Board of

Prison Terms, July 21, 2003; *see also*, *e.g.*, Exhibit 25, Life Prisoner Evaluation Report, August

2003 ("He understood the seriousness of his actions"); Exhibit 21, Life Prisoner Evaluation

Report, January 1993 ("He appears to have realized the consequences of his actions and has

demonstrated a maturation in judgment and emotion").)  The record reveals no evidence to

1   support the Governor's suspicion that, despite the conclusions of professional evaluators,

2   petitioner has still not fully accepted responsibility.

3           3.     Lack of remorse

4          Remorse is factor that tends to show suitability for parole where the inmate by

5   word and/or deed has shown remorse for the commitment crime.  15 Cal. Code Regs. §

6   2402(d)(3).  Remorse is demonstrated by acts "such as attempting to repair the damage, seeking

7   help for or relieving suffering of the victim, or indicating that he understands the nature and

8   magnitude of the offense."  *In re Scott,* 119 Cal.App.4th at 897.

9          The California Court of Appeal noted with respect to this factor:

10        The Governor took issue with the Board's finding Hodge had
    demonstrated remorse.  The Governor noted Hodge's claim of

11  remorse was unsupported by any source other than Hodge and that
    Hodge had not taken any action reflecting his acceptance of

12  responsibility or acknowledgment of his part in the murder.  The
    Governor compared Hodge's very brief letter to Allen's family in

13  1996 to the numerous versions of the incident Hodge had given,
    and the "continuation" written by Hodge at or about the same time

14  as the letter to the Allen family.  In addition to Hodge's comments
    mentioned by the Governor, Hodge noted in the continuation that

15  Allen could have survived on a respirator but, "because of the lack
    of money [Allen's family] determined that he be disconnected from

16  the system."  This statement also is inconsistent with remorse for
    causing Allen's demise.

17
    Thus, "some evidence" supports the Governor's finding Hodge has
18  not shown remorse for the life crime.  (*In re Rosenkrantz*, *supra*,
    29 Cal.4th at p. 658.)

19

20  (B180414 opinion at 15-16.)

21         The court of appeal's statement that petitioner "had not taken any action reflecting

22  his acceptance of responsibility or acknowledgment of his part in the murder" is plainly

23  inaccurate.  As the court of appeal notes in its very next sentence, petitioner wrote a letter to

24  Allen's family.  Although characterized as "very brief" by the Governor and court of appeal, in

25  reality the letter is two full handwritten pages, and appears to be a heartfelt expression of

26  remorse:

1       To: The Allen family,

2       What can I say or do on my behalf to express the regret that I have
felt over these many years.  I must admit, that I am so ashamed of
3       the way I acted on that horrible day of January 14, 1979.  If only, I
could turn back the clock and prevent my emotions from affecting
4       my behavior that day.  But I know that's impossible and sadly
realize that I have hurt the Allen family.  How can I expect the
5       Allen family to understand my actions, moreover, how can I ask
the family for forgiveness?  I feel hopelessly lost.  My one prayer is
6       that, somehow, somewhere within your hearts, you all, will find the
last ounce of hope which I pray exists and use it to heal the grave
7       wound I inflicted by my thoughtlessness and impulsive behavior on
that early morning.  I'll not attempt to minimize my actions, but I
8       sincerely want the Allen family and his loved ones to know that I
am very sorry for the pain I have caused your family by causing the
9       death of Mr. Thurman Allen.

10      I have asked for God's forgiveness, and I feel in my heart and soul
that I must seek forgiveness from his family and love (sic) ones, if
11      that's possible.

12      In closing this letter I can only hope and pray that God, the Allen
family and society will find it permissible to forgive me for my
13      actions on that morning of January 14, 1979.  Once again, I am
truly sorry.  I realize it has caused years of grieve (sic) for you, and
14      years of trying to correct the wrong I've done by being incarcerated
in prison.

15      Thank you for taking the time to read this letter.

16      Respectfully,

17      Mr. Arbbie M. Hodge

18

19  (Exhibit 38, Letter to the Allen Family from Arbbie Hodge, December 6, 1996.)  To the extent

20  the Governor simply doubts, without any support in the record, that petitioner's expressed

21  remorse is genuine, that does not constitute evidence of future dangerousness.

22       The court of appeal further cited as evidence that petitioner lacked remorse his

23  written statement that  "because of the lack of money [Allen's family] determined that he be

24  disconnected from the system."  This written statement was taken from the undated

25  "continuation" petitioner wrote explaining in great detail the events leading up to his offense, the

26  offense itself, and also its aftermath.  In the continuation, petitioner set forth the following

chronology:

> ...[W]e left before the police arrived, out on Pacific Coast Highway in Long Beach we rented a motel room for the rest of the night and we hung around Long Beach for a few days until [Hine's] brother informed her that an assault to commit great bodily injury warr[a]nt was put out on the both of us.  That same day we went to San Diego, CA and lived in motels and hotels until February 11, 1979, when I was arrested for shoplifting in Chula Vista by the Chula Vista Police Department.  After my arrest I informed the Chula Vista police of the warr[a]nt in Long beach, CA.  After a check they transferred me to San Diego County Jail.  The next day, 2-12-79, a Mr. Miller and another policeman from the Long Beach Police Department came and questioned me about the incident of January 14, 1979.  I told him that I didn't commit a murder.  A short time later that night [Hines] and myself [were] transferred to the city jail in Long Beach, CA.  The next morning on February 13, 1979 we [were] arraigned.
>
> Oh, yes, on January 18, 1979 the assault to commit great bodily injury warr[a]nt was drop (sic) and a murder warr[a]nt was issued after Thurman Allen was taking off (sic) the life supporting system. Dr. Harris, said that Allen, would remain alive as long as he was on the respirator.  But, because of the lack of money, the family members determined that he be disconnected from the system...

(Exhibit 31, "Continuation," undated at 7-8.)

Petitioner's statement regarding the respirator is indeed a bit off-putting, especially as it is set forth in the Governor's decision, outside the context of the detailed chronology.  The relevant question, however, is whether it constitutes some evidence that petitioner remained an unreasonable risk of danger to society, if paroled, at the time of the 2003 parole hearing.  The record does not support such a conclusion.

Importantly, petitioner did not make the respirator statement in response to questions about his responsibility for or role in Allen's death.  The statement in its context does not show that he lacks remorse for causing Allen's demise.  The Governor's unsupported conclusion that petitioner lacked remorse also contradicted the finding of the Board, which, unlike the Governor, had opportunity to observe petitioner directly.  *See In re Roderick*, 154 Cal.App.4th at 272 n.26 ("Just like trial judges, parole hearing commissioners are in the best position to evaluate both the credibility and the attitude of the inmate in the course of the

1    hearing.").

2            Moreover, the Governor's finding that petitioner lacked remorse contradicted,

3    without explanation, multiple conclusions in the record made by psychologists and other trained

4    professionals.  (*See*, *e.g.*, Exhibit 25, Life Prisoner Evaluation Report, August 2003 Calendar, at

5    1 ("Hodge states that when the victim died, his whole world shattered.  He understood the

6    seriousness of his actions and feels remorseful that the situation resulted as it did."); Exhibit 24,

7    Psychosocial Evaluation for the Board of Prison Terms, October 2000 ("He feels sad that the

8    crime happened and bemoans the fact that he cannot change the circumstances of it, but can only

9    make the future better."); Exhibit 37, Life Prisoner Evaluation, 1990 Calendar ("Mr. Hodge's

10   expression of remorse for the committing offense appears to have been genuine.  It appears the

11   first serious introspection Mr. Hodge has experienced recently has been as a result of his

12   participation in Category X program...").

13           Thus, there is ample evidence, some dating all the way back to 1990, that

14   petitioner has demonstrated remorse.  The Governor's conclusion to the contrary lacks

15   evidentiary support in the record and does not constitute some evidence that he is unsuitable for

16   parole.  *See In re Roderick*, 154 Cal.App.4th at 272 (declining to attribute significance to Board's

17   pronouncement of an inmate's lack of insight when it ignored the evidence presented by trained

18   experts).  The Governor's citation to petitioner's previous statements, taken out of context in the

19   manner set forth above, does not constitute reliable evidence probative to a determination of his

20   future dangerousness.  Accordingly, the Governor's skepticism regarding whether petitioner's

21   remorse is genuine does not support the denial of parole in this case.

22           4.      Parole plans

23           A prisoner's understanding and plans for the future, specifically where the

24   prisoner "has made realistic plans for release or has developed marketable skills that can be put

25   to use upon release," is a factor tending to indicate suitability for parole.  *See* 15 Cal. Code Regs.

26   §2402(d)(8).

34

1        Here, the court of appeal held as follows with respect to the Governor's

2  conclusion that petitioner's plans for parole were insufficient:

3        The Governor disagreed with the Board's finding that Hodge had
         reasonable plans for parole.  The record revealed Hodge planned to
4        reside at the Harbor House in Long Beach and that he had
         marketable laundry skills but that he had not obtained a job offer.
5
         The Governor noted Hodge had no employment history prior to the
6        commitment offense, he does not expect to receive social security
         benefits or financial assistance upon his release from prison, he has
7        no friends or family in the State of California to assist him and he
         had not obtained a job offer.  The Governor reasoned it was more
8        likely Hodge would return to his lifestyle of crime and gambling if
         he were paroled without means of support.  The Governor properly
9        could conclude Hodge had made insufficient efforts to secure job
         offers or develop a concrete job search strategy and that, absent
10       employment, Hodge is likely to resort to criminality to support
         himself.
11
         Given Hodge's unstable lifestyle prior to the commitment offense,
12       "some evidence" supports the Governor's finding Hodge would
         present a risk to public safety if released on parole without concrete
13       plans for his support.  (*In re Rosenkrantz*, *supra*, 29 Cal.4th at p.
         658.)
14

15  (B180414 opinion at 16.)

16        Once again, the conclusion of the Governor regarding petitioner's parole plans is

17  not supported by "some evidence."

18        First, the Governor's concern that petitioner "would return to his lifestyle of crime

19  and gambling if he were paroled without means of support" is unfounded.  Despite the court of

20  appeal's reference only to Harbor House, petitioner affirmatively demonstrated that he had two

21  viable options for his residence after parole.  The record reflects that both options would have

22  provided ample "means of support."  First, petitioner had been accepted by Harbor House Clean

23  and Sober Living in Long Beach, California, a "structured sober living house."  (Exhibit 40,

24  Letter from Assistant Director Jim Knutson to Board of Prison Terms, May 29, 2003.)  Petitioner

25  also demonstrated that the Salvation Army in Los Angeles "continues to extend its invitation for

26  Mr. Hodge, to enter the Bell Shelter or Harbor Light Facility once released."  (Exhibit 41, Letter

35

from Bridget Williams at the Salvation Army to Ms. Carol Daly, Chairperson, September 9, 2003.)  The Bell Shelter "is designed to serve self-motivated men and women who strongly intend to commit themselves to a structured self-help program" and offers "education, counseling, vocational training and on-the-job training" with the goal of "achieving employment and permanent housing."  In his decision, the Governor does not explain why such programs, which are specifically designed to transition inmates back into society, were not viable parole plans for petitioner.  *See Irons*, 358 F.Supp.2d at 944 (half-way house considered a realistic plan for parole).

Moreover, there is no requirement that an inmate obtain a formal job offer in order to be found suitable for parole.  It is not surprising that petitioner was unable to secure a firm offer of employment given his age, the fact that he is incarcerated, has no release date, and has no certainty of *ever* being released.  His failure to obtain a firm job offer does not, by itself, mean that he has not made realistic plans for release.  *See generally In re Andrade*, 141 Cal.App.4th 807, 817 (2006) (holding that "fool proof plans" are unnecessary; "The plain language of the regulation supports the opposite conclusion.  By referring to "realistic" parole plans, the regulation does not contemplate iron-clad and unrealistic plans.") (overruled on another ground by *In re Lawrence*, 44 Cal.4th at 1208).

The relevant regulation actually states that a factor indicating suitability for parole is that "[t]he prisoner has made realistic plans for release *or* has developed marketable skills that can be put to use upon release."  15 Cal. Code Regs. § 2402(c)(8).  It is undisputed that petitioner has developed marketable vocational skills while incarcerated.  At the time of the hearing, he had amassed nearly 10,000 documented hours as a Laundry Machine Tender.  (Exhibit 42, PIA Certificate of Proficiency, June 6, 2003).  The PIA Laundry Superintendent wrote:

> Mr. Hodge has maintained a professional and courteous attitude. His willingness to come in and work and giving that extra effort during lockdowns, fog line, or situations out of our control, is greatly appreciated... Specifically, Mr. Hodge has used his skills in operating our Steam EM. D'Hooge Flat Iron, Jensen Constellation

1    folder and the String Tier/Pak Tyer.  I would like to commend him
     for a job well done.  By maintaining this approach, I am sure that
2    Mr. Hodge will have success in his life when released from
     incarceration.

3

4    (Exhibit 43, General Chrono, June 12, 2003.)  Thus, the parole plans factor relied upon by the

5    Governor tends to show petitioner's *suitability* for parole, not his unsuitability.

6                    5.       Unstable lifestyle

7            The court of appeal held as follows with respect to the Governor's consideration

8    of petitioner's social history and pre-prison conduct:

9            Hodge's criminal history commenced at the age of 13 years.  He
             was placed on probation [at] the age of 14 years and was sent to a
10           reform school at the age of 15.  Hodge failed to complete high
             school and supported himself by playing pool and engaging in theft
11           related offenses.  Hodge was addicted to heroin until 1977 and
             continued to abuse illegal drugs and alcohol until his arrest.  Hodge
12           was arrested numerous times as an adult and sustained seven
             convictions prior to his arrest for the instant offense.  He
13           previously had been granted parole on three different occasions and
             Hodge was on probation in Ohio at the time he committed the
14           instant offense.  Hodge admits numerous marriages and children
             and Hodge appears to have lacked a permanent address for many
15           years prior to the murder.  Hodge was living unstably with his
             pregnant girlfriend in the residence of others who were involved in
16           a criminal lifestyle at the time of the commitment offense.

17           The Governor also disagreed with the Board's finding Hodge had
             maintained close family ties, finding instead Hodge had not
18           maintained direct contact with many family members.  Indeed, the
             record reveals Hodge was in contact with none of his children.
19           The Governor noted Hodge had been described as a sociopath in
             1998 and a psychological evaluation indicated he might present a
20           risk to the public if he returns to the use of drugs and alcohol.
             However, Hodge last attended AA and NA in 2001.
21
             Thus, "some evidence" supports the Governor's determination to
22           consider Hodge's unstable lifestyle prior to incarceration a
             circumstance that demonstrated unsuitability for parole.  (*In re*
23           *Rosenkrantz*, *supra*, 29 Cal.4th at p. 658; § 2402, subd. (c)(3).)

24   (B180414 opinion at 15-16.)

25           An "unstable social history" in the context of the state regulatory scheme means

26   "[t]he prisoner has a history of unstable or tumultuous relationships with others" and, where

present, is another factor tending to show that an inmate is unsuitable for parole.  15 Cal. Code Regs. § 2402(c)(3).  In his written decision, the Governor referenced petitioner's "numerous marriages and children" and noted that petitioner was not in contact with any of his children. The fact that petitioner has been party to multiple failed marriages does not necessarily mean that any of those relationships were unstable or tumultuous.  Similarly, despite not being in contact with any of his children, there is no evidence that petitioner has had an unstable or tumultuous relationship with any of them.  *See In re Roderick*, 154 Cal.App.4th at 268 ("The record shows an *absence* of any relationship with his natural parents, not any unstable or tumultuous relationships.") (emphasis in original).

Both the Board and Governor noted that petitioner had maintained other family ties during his incarceration.  (Exhibit 13, Subsequent Parole Consideration Hearing transcript, September 25, 2003 at 58 (panel member stating "[y]ou have maintained close family ties while imprisoned via letters, visits, and phone calls"); Exhibit 14, Indeterminate Sentence Parole Release Review, February 20, 2004 at 2 ("he has maintained ties with several siblings and cousins and has established other relationships via letters").)  In August 2000, it was noted that petitioner "appears reasonably socially connected."  (Exhibit 24, Psychosocial Evaluation for the Board of Prison Terms, August 2000).  In addition, during the entire time he has been incarcerated there has been no evidence of unstable or tumultuous relationships with other prisoners or staff members.  In sum, petitioner has no history of unstable or tumultuous relationships which make him currently unsuitable for parole.

In further discussing petitioner's "unstable lifestyle," the court of appeal appeared to be analyzing his criminal history, as opposed to his social history.  An inmate's criminal history tends to show unsuitability for parole insofar as it reveals that he "on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age."  15 Cal. Code Regs. §2402(c)(2). Conversely, the fact that a prisoner "does not have a record of assaulting others as a juvenile or

1  committing crimes with a potential of personal harm to victims" is a factor tending to indicate

2  suitability for parole.  15 Cal. Code Regs. § 2402(d)(1).  Although petitioner's criminal history,

3  including his juvenile record, could be fairly characterized as substantial, it is undisputed that the

4  commitment offense is his only known episode of violence.  Accordingly, the fact that he has no

5  criminal record of violence is a parole suitability factor, not an unsuitability factor.

6       The Governor and court of appeal also discussed petitioner's history of drug

7  abuse.  Drugs did not play a role in petitioner's life crime, however, he was addicted to heroin

8  until two years prior to the offense.  As the Board noted, "a prisoner's prior addiction is not an

9  appropriate consideration in determining parole suitability."  *In re Smith*, 109 Cal.App.4th 489,

10  505 (2nd Dist. 2003).  There is no evidence that petitioner is presently addicted to drugs, nor any

11  evidence that he used drugs or alcohol at any time during his incarceration.  In fact, the notion

12  that petitioner risks returning to a life of drugs and alcohol if paroled is wholly speculative and

13  unsupported in the record.

14       Petitioner has participated in treatment for drug and alcohol abuse.  (*See, e.g.*,

15  Exhibit 20, Psychological Evaluation for the Board of Prison Terms, February 1998 at 1 ("He

16  established a good track record in attendance at self-help programs, showing a preference for NA

17  over AA but doing both."); Exhibit 24, Psychosocial Evaluation for the Board of Prison Terms,

18  October 2000 at 4 ("He has participated at length in Narcotics Anonymous.").)  A chrono

19  reflecting petitioner's participation in 1998 and 1999 indicated he "demonstrated a willingness to

20  share openly with the group" and "made a commitment to himself to work the steps and the

21  traditions."  (Laudatory & (Good) Informative Chrono, 1999.)

22       As previously noted, petitioner's parole plans included residence at a sober living

23  home.  In addition, the special conditions of his parole included that he not use or possess

24  alcoholic beverages, and that he submit to testing for alcohol, THC and narcotics.  The Board

25  also indicated he would be required to participate in a substance abuse program such as AA or

26  NA.

1       The statement in the Governor's decision that a psychological report indicated that

2   petitioner might be "unpredictable" if he returned to drugs was from 1986.  (Exhibit 46,

3   Psychiatric Consultation, September 26, 1986 at 2.)  Since then, his prognosis for avoiding future

4   substance abuse improved, according to evaluators.  (Exhibit 47, Category X Psychiatric Council,

5   September 27, 1990 ("The council is in agreement that the subject appears highly unlikely to re-

6   offend insofar as violent crime is concerned.  His prior involvement with heroin remains of some

7   concern but he has had no difficulty remaining abstinent during incarceration and would probably

8   not have a serious problem on release... The subject's age and current level of maturation appear

9   to make a return to his earlier lifestyle rather unlikely."); Exhibit 35, Psychiatric Evaluation,

10   October 3, 1992 at 2-3 (noting that petitioner's offense was not related to his chemical abuse

11   problem and stating additionally that his "impulse control is excellent").)

12       On this record, petitioner's history of drug abuse does not constitute some

13   evidence that he is currently unsuitable for parole.  *See In re Smith*, 114 Cal.App.4th at 371

14   ("Consequently, we conclude that Smith's *past* desire for and use of drugs does not by itself

15   reasonably establish current unsuitability because there is no additional evidence to complete a

16   chain of reasoning between his past drug use and a finding that because of it he currently poses

17   an unreasonable risk of danger if released.  In other words, in the absence of some evidence to

18   support a reasonable belief that Smith *might* start using drugs again, the fact that he used drugs

19   extensively more than 20 years ago does not by itself represent some evidence that he is currently

20   dangerous.") (emphasis in original).  Here, like the inmate in *Smith*, petitioner has a history of

21   drug abuse, although he was not under the influence when he committed his crime.  Due to his

22   demonstrated rehabilitation in this area and the lack of evidence to the contrary, petitioner cannot

23   be found *currently* unsuitable because of his *past* drug use.

24       In discussing this factor the Governor and court of appeal also referenced an

25   evaluator's comment referring to petitioner as a "sociopath."  The context of the evaluator's

26   comment was as follows:

40

1      Impression and Recommendations:

2      This inmate seems to present the not unusual picture of a sociopath
       who simply matures into a new orbit of relative conformity and
3      responsibility.  If this is to happen, it most often takes place in the
       middle or late thirties.  Sociopaths who try to work their act on an
4      unstable inmate population tend to come up fairly quickly either in
       administrative trouble or badly injured.  This inmate, further, does
5      not look to be highly susceptible to violence, since the single
       known violent episode in his career is the commitment offense.
6
       Staff comments are very nearly all positive in nature.  The inmate
7      expresses strong hope to get on track and to apply his new skills in
       a conforming life style in the community.  If given an opportunity,
8      I expect he would do so."

9   (Exhibit 20, Psychological Evaluation for the Board of Prison Terms, February 1998 at 2.)  The

10  same evaluator also wrote in this report that "[p]rison adjustment has been exemplary," and

11  "[d]iagnostically, his behavior fits no criteria for any Axis I or Axis II psychiatric disorder.  By

12  history he has been... a heavy substance abuser and personality disorder.  Neither of these

13  categories now applies."

14        Thus, the 1998 evaluation cited by the Governor as a negative factor is actually

15  positive with its prediction for petitioner to have a successful parole.  Moreover, to the extent the

16  Governor relied on the 1998 reference to petitioner as a "psychopath who simply matures into a

17  new orbit of relative conformity and responsibility," he simply ignored more recent evaluations

18  addressing the same point:

19        Mr. Hodge has no diagnosed psychopathology which is related to
          his life crime.  He has never been diagnosed as having a severe
20        mental disorder, nor has he made any complaints of a mental
          disorder.  As related above, Mr. Hodge has a limited history of
21        violent type behavior and the life crime appears to have been
          situationally related.  Thus, in the opinion of this examiner, any
22        future parole considerations that the board would foresee for this
          inmate should be related to factors of his parole, rather than any
23        mental health issues.

24  (Exhibit 22, Psychological Evaluation for the Board of Prison Terms, July 2003 at 4; *see also*

25  Exhibit 24, Psychosocial Evaluation for the Board of Prison Terms, October 2000 at 4 ("He has

26  carried a diagnosis of Antisocial Personality Disorder, but currently evidences few symptoms of

                                              41

1  this, albeit in this controlled environment, and age and maturity have likely ameliorated aspects

2  of this personality style.").)

3           The Governor is not authorized to engage in such cherry-picking of the record:

4           [T]he Governor's reliance on a 1991 evaluation was irrational
            because he inexplicably ignored a much more current
5           psychological evaluation in the record.  The Governor did not
            indicate that he considered the 2002 evaluation, that he found any
6           problems in it or that he rejected it; instead, he simply ignored it.
            When deciding whether an inmate poses a danger if paroled in
7           2002, reliance on a 1991 psychological evaluation when a 2002
            psychological evaluation is available and not flawed in any
8           identified way supports an inference that the decision was arbitrary
            and the outcome predetermined.

9

10  *Thomas v. Brown*, 513 F.Supp.2d 1124, 1133-34 (N.D. Cal. 2006).  The immutable

11  circumstances of petitioner's pre-prison lifestyle, including his criminal history, do not support

12  the denial of parole in this case.

13           6.       Opposition by the Long Beach and Los Angeles Police Departments

14           The court of appeal noted the following with respect to the Governor's

15  consideration of opposition to petitioner's parole expressed by the Long Beach Police

16  Department and the Los Angeles County District Attorney's Office:

17           Here, a letter from the City of Long Beach Police Department
            opposed Hodge's request for parole.  It concludes by [ ] stating:
18          "Due to the merciless nature of the murder inmate Hodge
            committed in the blatant disregard for human life he displayed, it is
19           the opinion of the Long Beach Police Department that inmate
            Hodge has not served sufficient time to ensure rehabilitation and
20           should remain incarcerated for the term of imprisonment as
            prescribed by the sentencing court.  Inmate Hodge murdered victim
21           Allen while on probation for burglary, proving he is incapable of
            self-governing.  Inmate Hodge was not a productive member of
22           society prior to his first-degree murder[5] conviction and he would
            no doubt be a detriment and a liability to society [i]f he were
23           granted parole."

24           Also, a representative of the District Attorney of Los Angeles
            County attended Hodge's parole hearing and expressed opposition
25

26          [5] Petitioner's conviction is for second degree murder, not first degree murder.

                                      42

1   to the request.

2   (B180414 opinion at 17.)

3   Law enforcement's opposition to petitioner's parole was properly considered by

4   the Governor (*see* Cal. Pen. Code, § 3046(c)), however, it does not constitute some evidence of

5   petitioner's unsuitability.  *See In re Dannenberg*, 173 Cal.App.4th at 256 n.5 ("The District

6   Attorney's 'opinion' ... is not evidence, and therefore does not constitute 'some evidence'

7   supporting the Governor's decision.").

8   Moreover, the opinion of the Long Beach Police Department was based on the

9   gravity of the commitment offense and petitioner's other pre-prison conduct, factors which have

10   already been considered herein and rejected as no longer probative to a determination of his

11   current or future dangerousness.  The Long Beach Police Department additionally made clear its

12   view that petitioner "will never have served sufficient time to ensure rehabilitation and should

13   remain incarcerated for the term of life imprisonment..."  (Exhibit 49, Letters from Sergeant

14   Oliver to CSP-Solano, March 13, 2002, June 11, 2002 and June 25, 2002.)  Given the liberty

15   interest that flows from the mandatory language in California's statutory parole scheme, such

16   reasoning would clearly violate petitioner's right to due process if used to indefinitely deny him

17   parole.

18   As for the opposition by the Los Angeles District Attorney's Office, the statement

19   by the representative at the parole hearing was, in full, as follows:

20   I think what the prisoner is doing at this point, is developing the
     final version of the story, which I believe is going to end up being
21   the baseball bat was used to commit the murder.  And if so, that
     was a brutal murder indeed.  He has a previous record that is
22   horrendous.  I keep flipping through the pages and see a lot of
     arrests and many convictions.  So his performance on probation
23   was unsatisfactory.  I think the inmate needs a little bit more time
     to fully reflect on what exactly happened, take full responsibility,
24   and also, I haven't heard any parole plans.  I would submit that
     based on these facts, we would deny parole at this time.

25

26   (Exhibit 13, Subsequent Parole Consideration Hearing, September 25, 2003 at 52-53.)  Thus, the

1    district attorney's opposition also appeared to be based mostly on the immutable circumstances

2    of petitioner's offense and criminal history.  The conclusion that petitioner needs more time to

3    "fully reflect on what exactly happened" and "take full responsibility" appears to be based on the

4    incorrect notion that petitioner was admitting for the first time that he used a bat to commit the

5    offense.  This, of course, is not the case since petitioner had consistently reported use of a bat

6    since 1988.  Finally, although the representative stated he had not "heard any parole plans,"

7    petitioner's plans for parole were in fact discussed in detail at the hearing.  (*See* Exhibit 13,

8    Subsequent Parole Consideration Hearing, September 25, 2003 at 26-28.)

9            F.    Resolution

10           "All murders represent the basest form of human behavior.  [California] laws,

11   however, provide for mechanisms by which even murderers, in limited circumstances, are

12   entitled to be paroled."  *In re Lee*, 143 Cal.App.4th 1400, 1414 (2nd Dist. 2006).  "Release on

13   parole is said to be the rule, rather than the exception."  *In re Vasquez*, 170 Cal.App.4th 370,

14   379-80 (4th Dist. 2009).  The "overarching consideration in the suitability determination is

15   whether the inmate is currently a threat to public safety."  *In re Weider*, 145 Cal.App.4th at 589.

16   Nevertheless, the Governor failed to identify any reliable evidence in the record that petitioner

17   poses a current or future threat to public safety.  Instead, the available evidence plainly

18   demonstrates a contrary conclusion.  Because of the overwhelming evidence that petitioner no

19   longer poses a threat to public safety, and because of the lack of *any* evidence to support the

20   Governor's reversal of the Board of Prison Terms' grant of parole, the writ must issue.

21                          V.  CONCLUSION

22           For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

23   application for writ of habeas corpus be GRANTED.

24           These findings and recommendations are submitted to the United States District

25   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

26   days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: April 27, 2010

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE

45